DUFRESNE, Judge.
This Matter comes before us on an appeal from various judgments and amended judgments from the district court.
As per our Per Curiam issued August 5, 1986, we are consolidating the judgment of May 23, 1986, the amended judgment of May 30, 1986, the second amended judgment of June 5, 1986, and the amended judgment of August 13, 1986, into one appeal. Since we recognize that the Greater New Orleans Expressway Commission (GNOEC) considers that the development of oil production in the area poses a serious threat to the physical structure of the Causeway and we likewise are concerned with the safety and welfare of the public, we consolidated and expedited this matter to minimize the delays in appellate review.
The district judge granted a preliminary injunction prohibiting the drilling of a well in Lake Pontchartrain on State Lease 11982 except under certain enumerated restrictive and regulatory conditions, GNOEC has appealed these judgments. We affirm.
FACTS
Traver Oil Company (defendant), the holder of State Lease No. 11982, covering water bottoms in Lake Pontchartrain, has engaged in numerous drilling operations in the Lake. On December 3,1985, in accordance with the State Statutes governing same, Traver was granted a permit to drill a well at a point 2.2 miles north of the south shoreline of Lake Pontchartrain and 1338 feet west of the Lake Pontchartrain Causeway. Additionally, on November 26, 1985, the Department of Natural Resources, Coastal Management Division (DNR) issued to Traver a coastal use permit for the site. Pursuant to the provisions of R.S. 49:213.16(B), (C), the Greater New Orleans Expressway Commission (GNOEC) filed a petition for reconsideration. The DNR which had provided for some restrictions in the operations denied the petition for reconsideration. This prompted a suit against DNR and Traver under Docket No. 322-661 (not the present suit) in the 24th Judicial District Court. The United States Corps of Engineers issued its permit authorizing the operations on November 13, 1985.
*1206 On January 21, 1986, the GNOEC filed a petition against Traver seeking, under the provisions of Civil Code Articles 667 and 2317 and Code of Civil Procedure Articles 74 and 3601, injunctive relief to prohibit: (1) the drilling of a well at the location for which the State had issued the drilling permit, and (2) prohibiting the drilling of any well within one mile on either side of the Causeway. Upon filing of the petition, a hearing for a preliminary injunction (a temporary restraining order was not applied for) was set for February 13,1986. Apparently, because the original permit issued by the U.S. Corps of Engineers had been suspended on February 6, 1986, by consent of the litigants the hearing on the preliminary injunction was delayed.
Then, in April 1986, the U.S. Corps of Engineers reinstated its permit but with eleven specific restrictions or requirements imposed on the operations within one mile of the Causeway.
Subsequently, a court hearing was held on May 15, 1986, and the trial court granted a preliminary injunction enjoining any operation until a plan could be implemented for the drilling by Traver Oil Co.
On May 23, 1986, the trial court signed the judgment which provided “The preliminary injunction granted by the court on May 15, 1986 be and is hereby continued” and then enjoined Traver, its employees, agents, contractors and sub-contractors engaged in the drilling of a well on State Lease # 11982 as permitted by the State from entering the one mile zone on either side of the Causeway except under specified conditions enumerated in the judgment.
On May 29, 1986, pursuant to the provisions of Code of Civil Procedure Article 3612, The GNOEC filed a motion for a suspensive appeal. On May 30, 1986, the trial judge denied the suspensive appeal, granted a devolutive appeal and set the return date for the appeal on July 15,1986. Additionally, the trial court amended its original judgment by changing some of the restrictions and/or requirements imposed on Traver, including a requirement that Traver make GNOEC a named insured under its policy.
A writ application was filed in this court on June 2, 1986. In this application, GNOEC contended the trial court erred in denying its request for a suspensive appeal and asked that the panel grant one or alternatively grant a stay order pending a hearing on the devolutive appeal. On June 3, 1986, the panel denied the issuance of a stay order, granted a writ of review and ordered the entire record and transcript of the hearing to be filed with this court on or before June 5, 1986.
The panel was further informed there were additional hearings in the trial court which had resulted in further modifications of the requirements or restrictions contained in the original trial court judgment.
The transcripts of these hearings were ordered to be filed with this court and oral arguments were set for August 5, 1986. On that date this panel issued the Per Curiam to consolidate all the judgments issued in this matter into one appeal.
On August 13, 1986, the District Court issued a further amended judgment which continued all previous orders of the court and granted Traver Oil Co. an additional six weeks to complete its production activities in Lake Pontchartrain on State Lease 11982.
GNOEC filed a motion to stay all maritime activities by Traver, pending the appeal before this court. We granted the stay requested until further orders.
ISSUES
The main issue for our concern in this consolidated appeal is whether or not the District Court erred in allowing drilling activity and oil production activity within one mile of the Greater New Orleans Causeway Bridge because such activity presents a direct and serious threat to public safety and welfare.
Further, the appellant has urged us to prohibit future drillings or oil production activities as such will result in irreparable harm to the public safety and welfare.
*1207 Traver Oil Co. has “filed” an answer to the appeal and has presented arguments that the trial court lacked jurisdiction over these proceedings and that the GNOEC did not have a right of action in the matter. They have further urged that the trial judge erred in his judgment indicating that the drilling and oil production activities of Traver Oil Co. within the one-mile zone adjacent to the Causeway Bridge could cause damage to the safety of the Causeway and motorists using same.
Initially, we will consider the issues raised by the appellee in its answer and/or cross appeal (which we have never found in the record).
Traver cites La.R.S. 30:12 which vests exclusive jurisdiction to challenge the issuance of a drilling permit with the 19th Judicial Court for the Parish of East Baton Rouge, where the Department of Natural Resources is domiciled. We agree with GNOEC that this position lacks merit. GNOEC is not challenging the issuance of the drilling permit to Traver but is challenging the alleged dangerous commercial marine operations within one mile of the Causeway Bridge.
The wording of La.R.S. 30:12 provides that the suit be brought against the assistant secretary (office of conservation) as defendant. The Third Circuit in Theriot v. Mermentau Resources, Inc. 385 So.2d 939 (La.App. 3rd Cir.1980) held that the lawsuit was an attack on the permit issued by the Commissioner of Conservation and that under R.S. 30:12, such suit could only be brought in East Baton Rouge Parish.
Here there is no specific attack on the permit issued by the Department of Conservation and we agree with the ruling of the trial judge that R.S. 30:12 is not applicable here and that the 24th Judicial District Court does have jurisdiction.
Traver has also urged that the GNOEC has no right of action to seek injunctive relief, citing La.R.S. 30:204(F) and 30:218. This position was overruled by the trial judge. The main purpose of these statutes is to prevent any state agencies other than the Department of Conservation from establishing other permit requirements applicable to those with a Department of Conservation permit. There is no prohibition in either of the above two sections which prohibit the issuance of injunction to protect the public safety and welfare. Accordingly, we agree with the ruling of the trial judge on this issue.
Thirdly, Traver has submitted that the District Court erred in finding that intrusion into an area within one mile of the Causeway Bridge was dangerous per se. Although we agree that in accordance with LA.R.S. 30:204(D)(3) and (E), the well in question does not come under a suspect classification; it is located in an area within the one-mile “prohibited zone” of the Causeway Bridge as established by the Department of Wildlife and Fisheries. Activity within this area does present certain conditions and circumstances that must be properly addressed and must be controlled and restricted.
Finally, we must examine the main issue before this court concerning whether or not the District Judge erred in allowing drilling activity and oil production activity within one-mile of the Causeway Bridge. GNOEC has urged that this is a direct and serious threat to public safety and welfare of the Causeway Bridge and the motorists who use it.
The trial judge after review of the documents presented and the testimony of the many experts issued an injunction prohibiting Traver Oil Co. from drilling a well and performing other related oil production activities in Lake Pontchartrain on State Lease 11982, except under certain enumerated restrictive and regulatory conditions. (See Judgments Rendered—Appendix A, B, C.)
We have reviewed the record and documents and agree with the ruling of the District Judge. The Collision Avoidance Warning System (CAWS) as provided by LSA-R.S. 34:851.24(J) & (K) require the following:
*1208 J. Every commercial tug or towboat or self-propelled dredge operating on Lake Pontchartrain shall be equipped with transmitting and receiving devices compatible and appropriate for use with the Loran C. Early Warning System. If a commercial tug, towboat, or self-propelled dredge does not have the equipment required by this Subsection and if that vessel is under contract, the individual who hires the vessel shall be responsible for ensuring that the transmitting and receiving device required herein is provided aboard the vessel.
K. The commission is hereby authorized to make rules and regulations modifying the equipment requirements contained in this Section to the extent necessary to keep these requirements in conformity with the provisions of the federal navigation laws or with the navigation rules promulgated by the United States Coast Guard.
Said statute does not prohibit operations on Lake Pontchartrain but provides for an electronic warning system to the specified types of watercraft.
In the case at bar, to allow Traver to conduct its petroleum activities on State Lease 11982, will not compromise the “CAWS” alarm system nor necessarily cause any unsafe conditions to exist. The trial judge expressed it very adequately when he indicated that with the restrictions imposed by the Corps of Engineers and modified and expanded by the trial court “the area of the Traver drillsite is 'probably the safest part of the Causeway”. We agree.
There has been no positive testimony that the Traver operation at this location as restricted by the trial court will be unsafe. This is not to say that it is impossible for an accident to take place. However, the condition under which Traver has been ordered to operate does not appear to weaken the safety precautions and procedures of the CAWS System.
The GNOEC has further urged that this legally sanctioned project into the one-mile zone will serve as a precedent for future oil drilling operations close to the Causeway Bridge. This contention does present some problems. Although we realize that the one-mile prohibited zone is not protected by statute; this zone has become an area that the GNOEC would want restricted so that the CAWS alarm system can function as designed to protect the Causeway Bridge.
The ultimate responsibility of prohibiting “all” drilling or oil production activities within one mile of the Causeway Bridge rests with the Louisiana Legislature. However, we consider the possible danger to the Causeway Bridge and the safety of the motorists using it to be such that all means should be used to provide the highest degree of safety to all concerned.
We affirm the trial judge’s ruling to allow Traver Oil Co. to complete its production activities as regulated and restricted in his judgments, but we want to emphasize we do so under the specific conditions and posture in which this case comes before this court. Here the drilling of the well has been completed and only the connecting of the pipeline is necessary to place this well on-line.
Accordingly, we do want to stress that we do not intend for this opinion to necessarily serve as a precedent for future oil drilling operations near the Causeway Bridge. Each proposed drilling operation must obtain a permit and we urge the utmost care in the granting of future permits in the proximity of the Causeway Bridge. Basically, we hold that Traver can complete its operations on this location. Although there is no specific statute prohibiting drilling oil wells within one mile of the Causeway — there should be one— which would provide that the operations of the CAWS System as designed is not weakened or compromised in any manner.
We have considered the other contentions by GNOEC that Traver has not fully complied with the court judgments and conclude that these should be directed to the District Court on a Rule for Contempt. These arguments have no merit here and do not warrant consideration by this court.
*1209 Likewise, we find no merit in the appellant’s argument that the trial judge erred in accepting or in rejecting the testimony of various witnesses before the court. His judgments are supported by the record. Furthermore, his reasons for judgment reflect his prime concerns, the safety of the Causeway Bridge and motorists who use it.
CONCLUSIONS
For the reasons assigned, the judgments of the District Court are affirmed in all aspects.
It is further ordered that the stay order previously issued by this court on August 15, 1986, be revoked and rescinded. The six-week period granted Traver Oil Company for completion of its production activities in Lake Pontchartrain on State Lease 11982 shall begin no sooner than September 8, 1986, and no later than September 15, 1986.
All costs of this appeal are to be assessed against the appellant.
AFFIRMED; STAY ORDER REVOKED AND RESCINDED.
GRISBAUM, J., concurring in part and dissenting in part with written reasons.
NACCARI, J., concurring with written reasons.
APPENDIX A
AMENDED JUDGMENT
IT IS ORDERED BY THE COURT that the preliminary injunction granted by the Court on May 15, 1986, be and is hereby continued. All employees, agents, contractors and subcontractors of Traver Oil Company who are or might be engaged in the preparations for and the drilling of a well in Lake Pontchartrain on State Lease 11982 as permitted by the Louisiana Office of Conservation are prohibited from entering the one-mile zone on either side of the Causeway except under the following conditions:
A. Definition of Terms. The terms used, in Part B hereof have the following meanings:
(1) “Base station” means the office of the Louisiana Department of Wildlife and Fisheries which houses the Loran C Early Warning System, located on the New Basin Canal in New Orleans.
(2) “Bridge” means the bridge crossing Lake Pontchartrain operated by the Greater New Orleans Expressway Commission (GNOEC).
(3) “CAWS” means the Collision Avoidance Warning System.
(4) “CAWS unit” means the mobile unit required to be on board every commercial tug, towboat, and self-propelled dredge operating on Lake Pontchartrain by L.R.S. 34:851.24.
(5) “Drill location” means that location permitted Traver Oil Company for the drilling of a well by the Louisiana Office of Conservation on State Lease 11982.
(6) “GNOEC” means the Greater New Orleans Expressway Commission.
(7) “Inspector” means that person located on the drilling platform to monitor, control and be in charge of the surface vessel activities of the project, who shall be either employed by or approved by either the GNOEC or the Department of Wildlife and Fisheries, approval of which shall not unreasonably be withheld.
(8) “Prohibited zone” means a one-mile zone parallel to each side of the bridge.
(9) “Project” means all of the activities engaged in by Traver Oil Company to carry out the drilling, completion and connections of the well on State Lease 11982. ⅞
(10) “DWF” means the Louisiana Department of Wildlife and Fisheries.
(11) “DNR” means the Louisiana Department of Natural Resources.
*1210 B. The following procedures shall be followed:
(1) A GNOEC patrolman and patrol vehicle (bridge patrolman) will be stationed at the vehicular crossover located approximately 3.3 miles north of the South Toll Plaza on a 24-hour per day basis commencing with the first entry by a project barge or tug in the prohibited zone west of the bridge until the departure of the last such vessel. The bridge patrolman shall be equipped with binoculars and radio communication equipment which will enable him to communicate with the base station, with the Causeway Patrol, with other project vessels, and, after the drilling platform is in place, with the Inspector aboard the platform. In the event a patrolman cannot be provided by GNOEC, for any reason, for any period during which a patrolman is required to be stationed on the bridge, a state policeman may be substituted.
(2) All project vessels and the drilling barge (platform) shall be equipped with radio communication equipment which will provide communication links with the bridge patrolman, base station, and other vessels.
(3) Each project tug will be equipped with a CAWS unit, as well as any other vessel which requires such a unit under existing DWF procedures.
(4) Movements to or from the drill location by the work, shell, service and drilling barges and by transporting tugs shall be accomplished only during daylight hours in calm weather, and when there is clear visibility between the drill location, the bridge, and the location of the bridge patrolman. Any seas higher than four (4) feet shall not be considered calm weather.
(5) Movements of such vessels and equipment to the drill location shall be at a 45 degree angle to the bridge.
(6) At no time shall any vessel or equipment (except the escort vessel) exceed the speed of two knots when in the prohibited zone.
(7) Prior to and during the transport of the work and shell barges to and from the drill location, the following shall be implemented:
(a) The base station will be provided three (3) hour and one (1) hour advance notification of entry into the Prohibited zone by a Traver representative.
(b) Two (2) tugs will participate in the transport: One (1) for push and One (1) for pull. Only one barge shall be in tow.
(c) One (1) escort vessel will proceed in front of the work and shell barge while being transported within the Prohibited Zone.
(d) Barges shall always be moored to a tug when at the drilling location and when within one (1) mile of the bridge.
(e) Prior to transport, radio communication must have been established between the tug operator, escort vessel, bridge patrolman, and the base station. From that time on, continuous radio communication will be maintained between these same individuals.
(f) The base station shall be notified one (1) hour prior to and upon departure of the work and shell barges from the drill location.
(8)Prior to and during the transport of the drill barge to and from the drill location, the following shall be implemented:
(a) The base station will be provided three (3) hour and one (1) hour advance notification of entry into the Prohibited zone by the Traver representative.
(b) Three (3) tugs will participate in the transport: One (1) for push, one (1) for pull, and one (1) for constant assistance at port or starboard as the situation dictates.
(c) One (1) escort vessel will proceed in front of the drill barge in tow.
(d) Prior to transport," radio communication must have been established between the tug operator, escort vessel, bridge patrolman, and the base station. From that time on, continuous radio communication will be maintained between these same individuals.
*1211 (e) The base station shall be notified one (1) hour prior to and upon departure of the drill barge from the drill location.
(9) Prior to and during the transport of the service barge to and from the drill location, the following shall be implemented:
(a) The base station will be provided one (1) hour advance notification of entry into the Prohibited zone.
(b) Two (2) tugs will participate in the transport: One (1) for push, one (1) for pull. Only one (1) barge shall be in tow.
(c) One (1) escort vessel will proceed in front of the service barge in tow while being transported within the Prohibited Zone.
_ ® Prior to transport radio communication must have been established between the tug operator, escort vessel, bridge patrolman, and the base station. From that time on, continuous radio communication will be maintained between these same individuals.
(e) The base station shall be notified one (1) hour prior to and upon departure of any service barge from the drill location.
(10) All tugs shall have a minimum of three (3) crew members, of which two shall be awake at all time.
(11) When stationary at the drilling platform, barges shall always be securely moored to a tug as well as to piling or to anothér barge with tug which in turn will be moored to piling.
(12) The moorings and equipment shall be monitored by an Inspector who shall be stationed on the drilling platform on a 24-hour basis. This individual will maintain radio communication with the base station, the bridge patrolman and all vessels operating within the Prohibited Zone from the time of entry until the time of departure. The Inspector will be furnished a set of binoculars and a portable VHF and UHF radio (walkie talkie).
(13) A patrol boat will encircle the drill location on a 24-hour basis for surveillance.
(14) Traver shall require, in advance of any operation, that all persons engaged in such operation be thoroughly instructed in the procedures required by this order and the operational requirements of the DWF and GNOEC; and, further, that adherence to this order be made a provision of any contract with any person, firm or corporation undertaking any activities in connection with the project. Traver shall cause to be served upon all contractors, subcontractors, employees and agents engaged in the operation a certified copy of the injunction before such contractors, subcontractors, employees and agents commence operations pursuant to this plan, and Traver shall provide the Court with written acceptance of such service.
(15) The drilling platform inspector shall continuously inspect and monitor all moorings and carefully observe arrivals and departures at the drilling platform, and notify the base station, bridge patrolman, and attending vessels of (a) all arrivals and departures from the platform; (b) any intrusion of any vessel within 1100 feet of the bridge; (c) any breaking loose of any barge from its moorings to the drilling platform or its attending tugs; and (d) any other event which may possibly result in collision with the bridge.
(16) Any loss of power or steerage by a tug or breaking loose of any barge shall be immediately communicated by the tug operator to the base station, the bridge patrolman, the drilling platform inspector and other vessels.
(17) In the event of any emergency requiring deviation from any procedures described in this order, such deviation may be, and shall only be, carried out by authorization of the DWF or GNOEC through its designated officials.
(18) No tug, or barge in tow of a tug, shall be operated closer to the bridge than the drill location, except upon arriving and departing the drill location a maneuvering area of no more that 150 feet to the east side of the drilling platform may be utilized.
*1212 (19) In the event that a pipeline is to be connected to a completed well for the purpose of removing either oil or gas, or both, the procedures set forth herein for the drilling operation shall apply. Any storage tank platform shall be located more than one mile from the bridge.
(20) All vessels required by law to be equipped with CAWS units shall be so equipped at all times.
(21) When any vessel so equipped enters the Prohibited zone, in addition to acknowledging the alarm signal, it shall immediately communicate by radio with the base station, the bridge patrolman and, after the drilling platform is in place, the inspector on the platform, to report its identity and, if towing a barge, the make-up of its tow, its intended course to the drill location, and, if intending to moor to the platform, the side to which it will moor. From that time until the vessel departs the Prohibited zone it shall be under constant surveillance by (a) the bridge patrolman, (b) the escort vessel, (c) the patrol vessel, and, (d) after the drilling platform is in place, the inspector on the drilling platform. During this period of time the base station may disengage the vessel from the CAWS system, but may from time to time, if it deems appropriate, reconnect the CAWS system for the purpose of periodic computer interrogation.
(22) The CAWS system shall be temporarily modified for vessels that are specifically identified as being engaged in thepro-ject in the following manner: When any such CAWS-equipped vessel enters the Prohibited zone, after acknowledging the initial alarm, it shall continue to be interrogated every 45 seconds and computer tracked as the system currently operates, but the alarm sequence shall be discontinued (logged out) by action of the base station until the vessel departs the Prohibited zone. Provided, the alarm sequence will not be discontinued (logged out) until the base station is satisfied that the vessel is within the vicinity of the drill location necessary to the activities of the project; and, provided further, that the alarm sequence will be re-established (logged in) at any time the base station determines that the vessel is no longer within the vicinity of the drill location necessary to the activities of the project, and, provided further, that the alarm sequence shall be automatically reestablished if any vessel comes within 1000 feet of the bridge. The “alarm sequence” means that part of the current system which sounds an alarm on board the vessel and which provides an audible alert in the base station and repeated printout by the computer printer.
The modifications shall not affect the alarm sequence which is activated by a vessel moving at more than four miles per hour in either the Buffer zone or the Prohibited zone. Nor shall the modifications prevent the base station from re-establishing (logging in) the alarm sequence at any time it determines to do so. The alarm sequence shall be re-established (logged in) for a CAWS-equipped vessel when such vessel leaves the Prohibited zone.
The modifications shall provide a 100 foot level of accuracy in the Prohibited zone for the affected vessels.
The modifications shall not alter the current CAWS system in any manner for any vessel other than those specially identified as being engaged in this project.
Buoys shall be placed as aids to navigation in the operational area leading to and around the drill location. The buoys shall be located as follows:
a) At 200 foot intervals along a line 1000 feet west of and parallel to the bridge extending 500 feet to the north of and 500 feet to the south of the drill location, and
b) At 200 foot intervals for a distance of 1000 feet beginning at the southernmost buoy described in (a) and running perpendicular to the line of those buoys in a westerly direction, and
c) At 200 foot intervals for a distance of 400 feet beginning at the northernmost buoy described in (a) and running perpendicular to the line of those buoys in a westerly direction, and
*1213 d) At intervals of 900 feet beginning at the westernmost buoy described in (c) and extending in a straight line at a 45 degree angle from the line of those buoys in a generally northwesterly direction to the one mile boundary of the prohibited zone, and
e) At intervals of 900 feet in a line parallel to and southerly of the buoys described in (d) and extending the same distance; all of which are shown on the diagram attached hereto and made a part hereof.
All CAWS-equipped vessels shall approach and depart the drill location within the fairway delineated by the buoys described in (d) and (e) above, and when in the vicinity of the drill location, within the buoys described in (a), (b) and (c) above.
The cost of such modifications will be paid for by Traver Oil Company. In addition, Traver Oil Company will pay the full cost of maintaining additional personnel at the base station to provide monitoring of the tracking data on such vessels from sunrise to sunset. Should any such vessel operate closer than 1200 feet from the bridge, the regular personnel will immediately be notified by the personnel specially engaged.
After the system modifications described in this paragraph are in operation, the procedure described in the last sentence of Paragraph 21 shall be discontinued.
(23) Traver Oil shall, through contractual means, establish the right to dismiss any personnel from the project activity who violates any provision of this order, of any rule or regulation of the DWF or the GNOEC.
(24) Traver Oil shall hold the GNOEC harmless from any expense incurred by complying with this order and any damages sustained as a result of operations within the one-mile zone. Traver Oil in its liability or protection and indemnity insurance policy shall name GNOEC as a named insured in said policy with a waiver of subrogation in favor of GNOEC.
(25) The Court limits the operations to a thirty (30) day time period. Traver Oil shall notify the GNOEC, the Louisiana Department of Wildlife and Fisheries and the Court of the dates on which they will commence and cease operations.
(26) Any difficulties arising from this order will be heard without delay by telephone conference with all parties if the Court deems is necessary.
Gretna, Louisiana, this 30th day of May, 1986.
APPEAL COURT NOTE
This amended judgment is identical to the original judgment of May 23, 1986, except for the addition to No. 24 above which we have underlined.
*1214 [[Image here]]
APPENDIX B
SECOND AMENDED JUDGMENT
In accordance with the Court’s oral ruling in open court on June 4, 1986, after contradictory hearing, IT IS ORDERED that the Court’s Judgment, entered on May 23, 1986, as amended by the Court’s Amended Judgment of May 30, 1986, is further amended as follows:
1. Traver Oil Company, and all persons and companies associated with the Traver Oil Company project, are prohibited from moving or shifting any and all tugs, barges, or any other large commercial *1215 vessels within the Lake Pontchartrain CAWS Prohibited Zone, from sunset to sunrise, or during bad weather.
2. Traver Oil Company, and all persons and companies associated with the Traver Oil Company project, shall not move or shift any tug, barge, or other large commercial vessel within the Lake Pontchartrain CAWS Prohibited Zone, from sunrise to sunset, and during good weather, until it has notified the Lake Pontchartrain CAWS base station operator and the GNOEC, through the patrolman stationed on watch, and until it has complied with all other provisions of this Court’s judgment, as amended, as are applicable to the vessel shifting, or other vessel movement in question.
3. The intention of the Court’s Judgment is that all tug, barge and other large commercial vessel movement of any kind within the Prohibited Zone in any way associated with the Traver Project is within the scope of the Court’s Judgment, and is subject to the conditions of the Court’s judgment.
4. Traver Oil Company is ordered to distribute copies of this Second Amended Judgment to all personnel involved with its project, and to assure that all personnel involved with its project are aware of, and fully comply with, the provisions of the Court’s Judgment as amended. Gretna, Louisiana, this 5th day of June, 1986.
APPENDIX C
JUDGMENT
IT IS ORDERED by the Court that the motion by Traver Oil Company for an amendment to the previous Judgments of this Court is granted, and accordingly:
(1)Traver Oil Company is hereby granted an additional period of six weeks commencing no sooner than August 22, 1986, and no later than September 1,1986, within which to complete its production activities in Lake Pontchartrain on State Lease 11982 as previously allowed by this Court;
(2) All vessels restricted by this Order shall approach and leave the drillsite at an angle 90 degrees to the Causeway;
(3) In all other respects, the previous Orders of this Court relating to Traver Oil Company’s activities at this site shall remain in effect.
GRETNA, LOUISIANA, this 13th day of August, 1986.